## Hendricks v. Smith et al.

(Decided Dec. 12, 1933.)

700

RODES & HARLIN, GEORGE W. MEUTH, R. C. P. THOMAS, and HUFFAKER, HOGAN & BERRY for appellant.

MILLIKEN & MILLIKEN for appellees.

Opinion of the Court by Judge Clay—Affirming.

Forrest Hendricks and his employee, Ed Smith, had both accepted the provisions of the Workmen's Compensation Act (Ky. Stats., sec. 4880 et seq.). On March 10, 1931, Smith was injured, and a little over four months later he was paralyzed in his left side and rendered wholly unable to do any kind of work. Claiming that his paralysis was the result of his injury, Smith applied to the Workmen's Compensation Board for compensation. After an extended review of the evidence, the board found that his paralysis was caused by his injuries, and allowed him compensation at the rate of $9.75 a week for a period of 416 weeks, subject to a credit of 10 weeks' compensation. On petition for review the circuit court rendered judgment affirming the award. From that judgment this appeal is prosecuted.

The evidence before the board is as follows: On the day of the accident Smith was engaged with other employees in lowering a tobacco truck weighing about 400 pounds, when the truck slipped and pinned him between it and a brake beam, injuring him from his hip to his shoulder. Within a few minutes after the truck had been lifted off Smith, another truck came along and caught him from his heels to the top of his shoulder. According to Mrs. Hubert Howell, Smith's sister, Smith was in bed for about 6 weeks, and in terrible shape, and was hurt in his back and in his side. He complained of both. Since the accident he had

tried to sell Whitmer medicine, but could not make a go of it. At the time she testified his left side was paralyzed. He got up and went around, but was not able. He did this during a period of about 3 weeks. Elizabeth Smith, appellee's daughter, testified that after his injury he did not go back to work. Immediately after the accident he complained of his back hurting him, also his breast, and the doctor told him to try to work, and he tried but could not do it. He sold Whitmer products. Hattie Howell, a sister of appellee, testified that just after the accident he attempted to carry the Whitmer products, but failed. He was not able to do anything. He did not go home and go to bed immediately after the accident. She did not think he worked any more, although he may have worked an hour or two. At the time she testified he was as helpless as a baby. Dr. Eldon W. Stone made an X-ray of Smith's back and breast about November 1st, and found a practically complete paralysis of the left side. An X-ray examination developed that he had a fracture of the third or fourth rib where the rib had not united. "It looks like he probably had a fracture of one of his spinal vertebrae." On being asked if that was the cause of his paralytic condition, he said, "I would think so, because, furthermore, on examination I made a blood test on him and his blood test was negative; and I would think the injury was responsible for the paralysis." After stating that appellee gave him a history of his injury and he had made both a physical and X-ray examination, he testified as follows:

"8. Doctor, it is possible for a man to be injured and then, months, afterward, to become completely paralyzed as a result of that injury, is it not? A. Yes, it is. I would say this: if he hasn't got a true fracture of the vertebra there —and it isn't very distinct—there might be an injury to the cord and that might come on later. It doesn't have to happen at the time.

"Cross-Examination by Mr. Thomas.

"9. Now, Doctor, from your X-ray you concluded he had a fracture of the ribs? A. One rib.

"10. Now, the fact is that I notice from your language that 'it looked like he had a fracture of one of the vertebrae.' A. Yes, sir.

"11. Can you say positively that is a fracture of the vertebra? A. I couldn't say it is, altogether, Mr. Thomas. It isn't a true fracture. It looks like the vertebra might have been shoved down. Of course, there might have been some mistake in the findings on that. My idea is that he had more injury to the cord.

"12. That is only a conjecture on your part. You have no way of determining from the X-ray that that is the condition, have you? A. Well, I don't know about that. Of course, there are certain physical findings there that show it is possible his injury could have been responsible for his condition.

"13. I understand; but from the examination of your X-ray could you determine it was a displacement of the spinal cord—that there was a displacement of the spinal cord? A. I couldn't say definitely that he had a fractured vertebra. I just say it is suspicious that he had.

"14. Can you say he had an injury to his spinal cord only from deduction? A. I can say I think he had an injury to the spinal cord.

"15. That is a deduction of your own mind. A. Yes, sir.

"16. The X-ray does not show it. A. The X-ray does not show the spinal cord at all.

"17. There are many other things that would cause a paralysis besides the disarrangement of the spinal cord or the disarrangement of the vertebra, aren't there? A. I wouldn't think so, in this particular man's case, from the history given.

"18. Isn't it a fact that men are paralyzed very frequently who have no injury whatever? A. Yes; but it is usually due to syphilis, or something like that; and this man has a negative blood test.

"19. Isn't it frequently due to high blood pressure? A. I don't think so, in this particular case. It is possible.

"20. Don't paralysis sometimes follow high blood pressure, the bursting of an artery? A. Yes, sir.

"21. Isn't that the most common cause of paralysis, except where you find syphilis present? A. It is, in older people; but at this man's age I wouldn't think so. How old is he?

"Mr. Milliken. Thirty-seven.

"22. Aren't there cases where young people have high blood pressure? A. Yes, it is possible.

"23. So this paralysis this man had could have been caused by other things? A. It's possible.

"24. The only thing you know is that this man had an injury back in March, and from the history you were given of it, excluding syphilis and excluding high blood pressure and other causes, you think that possibly disarrangement of one of the spinal cords—A. Injury to the spinal cord.

"25. To the spinal cord, had affected this man? A. Yes, sir.

"26. By excluding these other things? A. Yes, sir.

"Redirect Examination by Mr. Milliken.

"27. Were there any evidences at all of high blood pressure? A. I believe his blood pressure at the time was around a hundred and thirty or thirty-five—something like that.

"28. Is that extremely abnormal for a man of his age? A. Well, I wouldn't say so.

"29. Was that sufficient to cause paralysis? A. At the time I examined him it would not have been.

"30. If he had had a breaking of a blood vessel in his head you could have told it, couldn't you? A. I don't know. I couldn't say that. I didn't see the man until November, and he had his stroke in March, I think.

"Recross-Examination by Mr. Thomas.

"31. Sometimes a man has high blood pressure when he doesn't ordinarily run a high blood pressure, doesn't he? Sometimes it just runs up? A. You mean runs up suddenly, from excitement, or something like that?

"32. Yes. A. Well, that's possible.

"33. Assuming this man had a blood pressure of 160—65 previous to this paralysis, wouldn't that indicate very high blood pressure for a man thirty-six years old. A. Yes, it's rather high."

Dr. B. F. Rutherford, a witness for appellant, testified that he waited on appellee about March 10th. Appellee had a fracture of what he took to be his second or third rib on the left side, and he applied adhesive tape, the usual dressing for a fractured rib. Appellee complained a good deal for quite a number of days. Appellee told him that he did a day's work on the farm. He never made any X-ray examination. He saw him several times after the paralysis. The witness then expressed the opinion that appellee's paralysis was not due to his injury, and gave as his reason that, if there had been an injury to the spinal cord, paralysis would have been immediate, and would have been from the place of injury down. He did not remember that appellee made any complaint of injury to his back. In his opinion, blood pressure of 160 for a man 37 years of age was high, and was not caused by the accident. If the blood pressure afterward went to 138, it would indicate that it was lowered by his long confinement and rest. On cross-examination he testified that he examined appellee on March 10th for an insurance policy, and he seemed to be all right. It was an industrial policy, and the examination was very slight. He did not take his blood pressure, as that was not required. He did listen to his heart. At that time he seemed to be in good physical condition. It was possible that an injury to the base of the spine or spinal cord could disarrange the vertebrae in his neck to such an extent that it would make him a paralytic, but in his opinion the paralysis would be immediate. Dr. John H. Blackburn saw appellee on July 17th, at which time appellee was not paralyzed. He testified from a memorandum and stated that appellee weighed 182 pounds. His former weight was 208 pounds. He had a dislocation upward and backward of the inner end of the clavicle, with a depression on the left side of the second and third ribs. Under this depressed area there was impaired resonance on percussion, although no abnormal sounds were heard. His pulse was 92, and he had a blood pressure

of 160. He did not recall that appellee made any complaint of his back. Appellee spoke about hemorrhages from the lungs for 3 days after the injury, having had 10 hemorrhages in all. Afterward he examined appellee about August 18th. He was then paralyzed. In his opinion the paralysis was not due to appellee's injuries. Any injury to the spinal cord might produce paralysis, but almost without exception such injuries would produce paralysis of the structures below the site of the injury. Furthermore, if there was an injury to the cord, paralysis would be on both sides. If appellee's whole left side was paralyzed, the site of the trouble would be in the right hemisphere of the brain. If appellee had had a blow on his chest, and at the same time his brain had been injured, paralysis would have developed in 12 to 24 hours.

Appellee testified as follows: He had been working for Mr. Hendricks between 4 and 6 weeks. He was injured in the chest and in the spine. He had never been able to do any work since, and had worked only one day. He was confined to his bed about 7 weeks. After the accident, his condition was mighty bad. He had pains in his chest, side, and spine. From the time he was hurt, it seemed that his arm was numb, and about 4 weeks from that time the grip in his left hand began gradually to give way. It seemed to him that his leg was numb, too. His condition gradually grew worse until he became paralyzed. He had tried to walk, but could not. After the accident, he stirred around some and drove his car. Part of the time he did the driving and part of the time he did not. When he went to see Dr. Blackburn, he walked. At the time of his injury he was receiving $15 a week. The year before he worked for Mr. Bohannon at $9.75 a week. He was in good health before the accident, and could lift heavy loads.

The main insistence is that there was no evidence of probative value tending to show that appellee's paralysis was due to his injury. In this connection attention is called to the following statements of Dr. Stone:

"It looks like he probably had a fracture of one of his spinal vertebrae. * * * I would say this, if he hasn't got a true fracture of the vertebrae, there, and it is not very distinct, there might be an injury

to the cord and that might come on later. \* \* \* It is not a true fracture. It looks like the vertebræ might have been shoved down. Of course there might have been some mistake in the findings on that. My idea is he had more injury to the cord. \* \* \* I could not say definitely that he had a fractured vertebra. I just say that it was suspicious that he had.''

From these statements it is argued that Dr. Stone's opinion was not direct or certain, but vague and indefinite, in that he merely indicated that it looked like appellee probably had a fracture of one of the spinal vertebræ, that it was suspicious that he had, and that there might be an injury to the cord that came on later. Notwithstanding these expressions, it must not be overlooked that Dr. Stone said, ''I can say I think he had an injury to the spinal cord,'' and that was a deduction from his own mind. Clearly this was an opinion based on his own examination. But this is not all of appellee's case. He had never been injured prior to the accident, and was in good health at the time. Indeed, he was examined for insurance and found a good risk. The evidence leaves no doubt that appellee was severely injured on March 10th. Though it be true that after that time he returned to work for half a day and worked a day on his farm, walked about some, and drove around in his machine selling Whitmer medicine, there is evidence that he was in bad condition and worked with great difficulty. Aside from this, appellee testified that he suffered severe pain in his spine; that he weighed 200 pounds at the time of the accident, and only 145 pounds at the time he was paralyzed, that he felt a numbness in his hand and in his arm; that he began to lose his grip; and that he gradually lost control of his limbs on his left side. In addition to this, the Wassermann test was negative, and there was no evidence whatever of high blood pressure prior to the accident. In view of these facts, and of the opinion of Dr. Stone that appellee's injuries could produce, and probably did produce, paralysis, it cannot be said that there was no evidence of probative value supporting the board's finding of facts, a condition which must exist before we are authorized to set it aside. McCombs Coal Co. v. Alford, 234 Ky. 42, 27 S. W. (2d) 430; Harvey Coal Corporation v. Pappas, 230 Ky. 108, 18 S. W.

(2d) 958, 73 A. L. R. 473; Coneva Coal Corporation v. Morris, 223 Ky. 839, 4 S. W. (2d) 1111.

The further point is made that the board made no finding excluding the results of any pre-existing disease as required by section 4880, Kentucky, Statutes. The argument is that appellee's high blood pressure prior to his paralysis should have been taken into consideration in fixing his compensation. The words "pre-existing disease" mean a disease existing prior to the accident. All that we have is that several weeks after the accident appellee had high blood pressure. There was no evidence whatever that prior to the accident he had high blood pressure or was suffering from any disease. In the circumstances the board was not required to make any finding relative to a pre-existing disease.

Lastly, it is insisted that, as appellee was employed only during the tobacco season, which did not last more than 12 weeks, compensation should not have been based on the average weekly wage he was then receiving. In reply to this contention, it is sufficient to say that working at "full time" within Kentucky Statutes, sec. 4905, providing that compensation should be computed at the average weekly wage earned by the employee at the time of injury, reckoning wages as earned while working at full time, means the time during which the employee is offered employment, and does not include the time during which he has no opportunity to work, as where the employer operates his business for only a portion of each year. Beaver Dam Coal Co. v. Hocker, 202 Ky. 398, 259 S. W. 1010; Chatfield v. Jellico Coal Mining Co., 205 Ky. 415, 265 S. W. 943.

Judgment affirmed.